[799 NYS2d 205]

In the Matter of The Coalition Against Lincoln West, Inc., Doing Business as Coalition for a Livable West Side, et al., Respondents, v Iris Weinshall, as Commissioner of the New York City Department of Transportation, et al., Appellants.

First Department, July 14, 2005

APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Elizabeth S. Natrella, Leonard Koerner, Gail Saunders* and *Heidi Rubinstein* of counsel), for municipal appellants.

*Sive, Paget & Riesel, P.C.*, New York City (*David Paget, Steven C. Russo* and *Jennifer Coghlan* of counsel), for Hudson Waterfront Associates, appellant.

*Allen & Lippes,* Buffalo (*Richard J. Lippes* of counsel), and *Levy, Phillips & Konigsberg*, New York City (*Stanley J. Levy* of counsel), for respondents.

*Antonia Levine Bryson*, New York City, and *Amanda Hiller*, New York City, for Riverside South Planning Corporation and another, amici curiae.

*Marc Andrew Landis*, New York City, for City Club of New York, amicus curiae.

## OPINION OF THE COURT

Sweeny, J.

We are asked to determine whether, under the facts of this case, a supplemental environmental impact statement (SEIS) was required to be prepared and circulated before the issuance of a road closure permit.

This development project and concurrent litigation have a lengthy history. Some of the petitioners, which consist of various residents and organizations of residents and some of their elected officials, have participated in litigation involving a predecessor development project known as "Lincoln West." Although that project had been abandoned, petitioner coalition has retained the name identified with it. The current developer is respondent Hudson Waterfront Associates. Respondent New York City Department of Transportation (DOT) is acting as the lead agency for the present phase of the project. The amici curiae parties represent a consortium of leading environmental and planning organizations, as well as neighborhood residents. Amicus curiae Riverside South Planning Corporation had

negotiated with the developer the configuration of the resulting project, taking into account the concerns of the environmental and planning organizations that comprised its membership. Its membership interests were aligned with those of the developer during the 1990s litigation on this project. Amicus curiae Committee for Environmentally Sound Development seeks to minimize the impact of large scale development. It had earlier joined the present petitioners against respondent Hudson Waterfront Associates in litigation involving construction of Riverside Boulevard in connection with this project. However, it currently argues in favor of the closure of the 72nd Street exit ramp as a traffic mitigation measure and is therefore contrary to petitioners' position on this appeal.

The project itself is large and complex, consisting of several interlocking elements. It is located on approximately 74 acres on the West Side of Manhattan between 59th and 72nd Streets along the Hudson River and calls for the construction of 16 buildings containing mixed-use facilities, as well as a 21.5 acre waterfront park. Construction is to take place in two phases: Phase I consists of the construction of eight buildings between West 72nd and West 64th Streets. Phase II consists of the construction of the remaining buildings between West 64th Street and West 59th Street. Five buildings have been constructed to date, with two others presently under construction. The project has been the subject of tremendous public interest and controversy, and has spawned much litigation since its inception.

The present controversy concerns the proposed closure of the 72nd Street ramp from the West Side Highway/Henry Hudson Parkway, and the southern extension of Riverside Drive. The final environmental impact statement (FEIS) was published in 1992 and, as required by the State Environmental Quality Review Act ([SEQRA] ECL art 8), analyzed the entire project, including the cumulative impacts for the two proposed phases of construction. At that time, the closure of the 72nd Street ramp and the correlating transportation adjustments were assumed to be an integral component of the project but, lacking approvals from the necessary permitting agencies, were not scheduled for construction. Rather, the proponents of the project at the time made the assumption that the ramp would be closed and incorporated this assumption into the FEIS. It was further assumed, for the purposes of the FEIS, that if closure were ultimately disapproved, a new full environmental impact

review process would be necessary under both the state and city environmental laws. However, the impact of the closure was evaluated as part of the overall FEIS.

Given the fact that construction of the project was to take place in two phases, the 1992 FEIS focused, inter alia, on two alternative plans for the West Side Highway, each of which would have consequences for the contours of the Riverside Drive extension, its connections, and how it tied in with existing traffic arteries, including at 72nd Street. Since the decision regarding the relocation of the highway was assumed, at the time, to require a separate agency action, it could not, at that point, be determined which alternative would be incorporated into the final plan. As a result, both alternatives were analyzed. As to each alternative, the closure of the 72nd Street exit was relevant and assumed. Hence, the FEIS focused on the overall street and traffic patterns the project would engender, rather than the 72nd Street exit closure as a distinct element. The exit was relevant and reviewed only insofar as it tied in with the larger plan. The scheduling of the exit closure necessarily ties in with final decisions regarding realignment and/or reconstruction of the West Side Highway. Construction of the Riverside Drive extension necessarily is also tied in with the exit closure. These are linked, rather than separate events.

With respect to traffic patterns resulting from the exit closure, the traffic studies incorporated in the 1992 FEIS found that closure of the exit will have, at most, marginal traffic impacts during construction and ultimately will have an ameliorative effect on traffic in surrounding areas. Of note is the fact that the 79th Street exit is located a short distance north of the 72nd Street exit.

In February 2003, respondent developer formally requested that respondent DOT, the agency with jurisdiction over exit ramp closures, authorize the closure of the 72nd Street exit pursuant to the 1992 FEIS. The request acknowledged that if DOT identified significant environmental impacts not identified in the FEIS, a SEIS would be needed. It further acknowledged that agreed-upon mitigation measures would be implemented in connection with the closure, as specified in the FEIS, and a new traffic study would be undertaken.

In May 2003, the developer submitted to DOT, as lead agency, and to the New York City Department of Environmental Protection and the City Planning Commission (the latter being "interested agencies" under SEQRA), a Technical Memoran-

dum specifically analyzing whether the exit closure would result in any significant adverse traffic, air quality or noise impacts that were not identified in the 1992 FEIS. This memorandum stated that absent the closure, it would not be possible to create north/south traffic connections between West 72nd Street/ Riverside Drive and Riverside Boulevard. Further, an alternate design analysis had been conducted assuming no closure of the 72nd Street exit, which was found to be neither feasible nor safe. The methodology and area of the updated 2003 traffic study projections for following years were identified. The memorandum, which is extensive and comprehensive, contained studies that evaluated whether conditions had changed since the drafting of the FEIS, and specifically targeted the 72nd Street exit. DOT issued comments, requested additional traffic studies as well as revision of estimates based on updated data, and requested another "No Build" model be developed and factored into the memorandum. The Technical Memorandum was revised and addressed the concerns raised by DOT's comments.

On January 9, 2004, DOT issued a findings statement which, inter alia, stated that the relevant SEQRA and City Environmental Quality Review (CEQR) requirements were considered, reasonable alternatives (including a "No Build" alternative) were evaluated, and specifically evaluated was whether the passage of time allowed for the occurrence of impacts not identified in the FEIS. The findings statement specifically found that the FEIS had "fully analyzed and disclosed the potential environmental impacts that would result from the project, inclusive of the closure of the West 72nd Street off-ramp," certified that the requirements of CEQR and SEQRA were satisfied, and concluded that the action proposed by the developer was the one that avoided or minimized adverse environmental impacts to the maximum extent practicable. DOT thereafter granted the approvals for the ramp closure.

Petitioners challenged that decision and the adequacy of the environmental review in connection therewith, arguing that either a new EIS must be prepared for closure of the exit ramp and related roadway alterations, or in the alternative, the existing FEIS must be supplemented with new studies, subject to public comment, specifically addressed to the ramp closure and related roadway alterations.

The IAS court, in nullifying the administrative action, found that the FEIS was deficient in that it did not adequately analyze

the impact specifically related to the closure of the 72nd Street exit ramp. It further found the DOT determination was not supported by the FEIS, and that the reference in the FEIS to the closure requiring separate discretionary approval indicated a future environmental review process specifically aimed at the exit closure. The court concluded that the deficiencies in the FEIS could not be remedied retroactively by the 2003 Technical Memorandum, and granted petitioners' motion for summary judgment.

The essential issue before us is whether the 1992 FEIS took the requisite "hard look" at this relevant area of environmental concern, thereby obviating the need for a SEIS. A related issue is whether the process utilized by the reviewing agency and its subsequent determination in the findings statement—namely, that the FEIS was adequate and did not support the need for a SEIS—was proper.

We reviewed the 1992 FEIS in *Coalition Against Lincoln W. v City of New York* (208 AD2d 472 [1994], *affd* 86 NY2d 123 [1995]) and found it to be complete. Although the current lead petitioner was also the lead petitioner in that prior litigation, the 72nd Street exit closure and sufficiency of the related traffic studies were not raised as issues at the time of the challenge to the FEIS. There is no indication in the record why these issues were not raised at that time.

The FEIS did include an analysis of the closure of the 72nd Street exit as it factored into the street reconfiguration of the west side of the project. Moreover, the FEIS made clear that the project, as analyzed therein, incorporated construction of the Riverside Drive extension, the proposed connections north and south, and closure of the exit. It also made clear that *if* these facts changed (i.e., if the ramp were not closed), then a new EIS would be required. Thus, when the FEIS was certified as complete, agency action was final as to those components of the project, even if formal approvals were necessarily deferred until such time as construction of the project reached that point. Accordingly, the challenge here is properly to the FEIS, not the issuance of a construction permit or approval (*see Stop-The-Barge v Cahill*, 1 NY3d 218 [2003]), nor to the phasing of the project (*Matter of Long Is. Pine Barrens Socy. v Planning Bd. of Town of Brookhaven*, 78 NY2d 608 [1991]).

Early and comprehensive public involvement, prompt agency action and timely review serve the legislative goal of SEQRA by settling design issues at an early stage and providing a final ap-

proval upon which the developer and the municipality may rely (*see* 6 NYCRR 617.1). The fact that the current phase of the larger, integrated project occurred more than a decade later does not change the SEQRA analysis.

The time to challenge the relevant studies contained in the FEIS was within four months of the final agency action (CPLR 217 [1]; *Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp.*, 291 AD2d 40 [2001]). This was not done here.

Petitioners' focus on the 72nd Street exit ramp closure as a separate and distinct element of the larger project, requiring a separate SEQRA process, including public hearings, amounts to a segmented review of this project. Any "reasonably related long-term, short-term and cumulative effects" of a given project, "including other simultaneous or subsequent actions which are included in any long-range plan of which the action under consideration is a part," must be considered by the reviewing agency as part of the SEQRA review process (*Matter of Farrington Close Condominium Bd. of Mgrs. v Incorporated Vil. of Southampton*, 205 AD2d 623, 626 [1994]). Such a segmented review for different parts of an integrated project as petitioners seek herein is impermissible and inconsistent with the legislative intent of SEQRA (*Matter of Village of Westbury v Department of Transp. of State of N.Y.*, 75 NY2d 62, 69 [1989]; *Matter of Farrington Close*, 205 AD2d at 626).

The IAS court's conclusion that the requisite "hard look" was not taken is belied by the record. The exit ramp closure is a small component of a very large project and did not require lengthy discussion in the FEIS. However, since the closure has always been an essential component of the project, it was considered in the larger context of air quality, traffic control, noise, etc. and was analyzed in that context. For example, starting with the executive summary and continuing through the traffic analysis portion of the FEIS, the record contains repeated references to—and analysis of—the ramp closure. The traffic studies and the impacts of the closure and mitigation measures connected therewith are discussed, air quality impact of the project is analyzed, on the assumption that the exit ramp will be closed, and this analysis continues in the DOT statement of findings issued on January 9, 2004. DOT found the FEIS had fully analyzed the potential environmental impact resulting from the project, "inclusive of the closure of the West 72nd Street off-ramp to accomplish the connection of Riverside

Boulevard to West 72nd Street" (Statement of Findings, at 3). After discussing the results of the FEIS with respect to traffic, noise and air impacts and the mitigation proposal contained therein, including alternatives to the ramp closure, DOT analyzed the results of the updated studies included in the Technical Memorandum and concluded that "the closure of the West 72nd Street off-ramp, as a component of the Riverside South development project, would not result in significant adverse traffic impacts at any locations" (*id.* at 13). It went on to find that the ramp closure "would not have any significant adverse air quality impacts" and "would not result in significant adverse noise impacts in any locations" (*id.* at 14). Alternatives to the ramp closure were analyzed and rejected as not feasible or unsafe (*id.* at 8-9).

While petitioners contest the conclusions drawn from the studies, and contend there were better alternatives, this is not a basis to invalidate the FEIS (*see Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400 [1986]; *Roosevelt Islanders,* 291 AD2d at 51-52).

"Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion' (CPLR 7803 [3] . . .)" (*Akpan v Koch,* 75 NY2d 561, 570 [1990]). In applying this standard of review, "it is not the role of the court to weigh the desirability of the proposed action, choose among alternatives, resolve disagreements among experts, or substitute its judgment for that of the agency" (*Matter of Fisher v Giuliani,* 280 AD2d 13, 19-20 [2001]). Judicial review is limited to a determination as to whether the lead agency "identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination" (*Matter of Jackson,* 67 NY2d at 417).

The SEQRA regulations provide that a

"lead agency may require a supplemental EIS, limited to the specific significant adverse environmental impacts not addressed or inadequately addressed in the EIS that arise from:

"(*a*) changes proposed for the project;

"(*b*) newly discovered information; or

"(c) a change in circumstances related to the project" (6 NYCRR 617.9 [a] [7] [i]).

The purpose of a SEIS is to account for new information bearing on matters of environmental concern not available at the time of the original environmental review (6 NYCRR 617.9 [a] [7]). On the basis of the Technical Memorandum and its revision, the criteria set forth in the CEQR Technical Manual, and its independent review, DOT concluded that a SEIS was not warranted. DOT, as lead agency, is entitled to judicial deference (*Akpan,* 75 NY2d at 570; *Matter of Jackson,* 67 NY2d at 417). The record fully supports DOT's determination that the environmental review process had adequately reviewed the environmental concerns regarding the exit closure (*Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Planning Commn. of City of N.Y.,* 259 AD2d 26 [1999]).

Moreover, the agency's determination that a SEIS was not required for this part of the project was procedurally correct (*Roosevelt Islanders,* 291 AD2d at 52). The Technical Memorandum was not an attempt to correct a deficient FEIS. The information contained in the studies did not identify any significant impacts not identified or considered in the original FEIS. Rather, the information was utilized to update the studies already analyzed in the FEIS. The decision not to require a SEIS does not require a hearing or public comment (*Matter of Jackson,* 67 NY2d at 430). Moreover, DOT was not required to consider alternatives it considered infeasible (*Matter of South Bronx Clean Air Coalition v New York State Dept. of Transp.,* 218 AD2d 520 [1995], *lv denied* 87 NY2d 803 [1995]).

In sum, the record amply supports the conclusion that the lead agency took the requisite "hard look" at the environmental impact as required by SEQRA, and set forth a reasoned elaboration for its determination (*Matter of Merson v McNally,* 90 NY2d 742, 751 [1997]).

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Doris Ling-Cohan, J.), entered October 27, 2004, which nullified DOT's approval of closure of the 72nd Street ramp, enjoined further construction to that end, and remanded to that agency for further environmental review, should be reversed, on the law, without costs, the petition denied, and approval for closure of the ramp declared valid.

Motions seeking leave to file an amicus curiae brief and for postargument submission granted.

BUCKLEY, P.J., ELLERIN and WILLIAMS, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered October 27, 2004, reversed, on the law, without costs, the petition denied and approval for closure of the 72nd Street ramp declared valid. Motions seeking leave to file an amicus curiae brief and for postargument submission granted.